# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 818 | **DATE** | 8/8/2002 |
| **CASE TITLE** | William H. Lindeman vs. Village of Oak Brook, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for summary judgment (Doc. No. 25-1) is granted in part and denied in part. This matter is referred to Magistrate Judge Sidney I. Schenkier for a settlement conference. Jury trial date of December 16, 2002 stands.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | **3** |
| ✓ | Notices mailed by judge's staff. | | number of notices |
| | Notified counsel by telephone. | | AUG 0 9 2002 |
| | Docketing to mail notices. | | date docketed |
| | Mail AO 450 form. | | docketing deputy initials |
| | Copy to judge/magistrate judge. | | 8-8-02 |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 02 AUG -8 PM 2: 43 | date mailed notice |
| | | Date/time received in Central Clerk's Office | mailing deputy initials |

**Document Number**

**49**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM H. LINDEMAN, | ) | **JOCKETED** |
| Plaintiff, | ) | **AUG 0 9 2002** |
| v. | ) No. 00 C 818 | |
| VILLAGE OF OAK BROOK and CHIEF DEBRA JARVIS, | ) Judge Rebecca R. Pallmeyer | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Prior to submitting his resignation on June 5, 2000, Plaintiff William H. Lindeman was employed by the Oak Brook Fire Department as a firefighter. After resigning, Plaintiff brought suit against Defendants Village of Oak Brook ("Oak Brook") and Debra Jarvis, Chief of the Oak Brook Fire Department ("Chief Jarvis").[1] Plaintiff's complaint alleged that Oak Brook discriminated against him in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* and the Americans With Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* Plaintiff's complaint also included a claim under 42 U.S.C. § 1983, alleging that Chief Jarvis retaliated against him for exercising his right to free speech.

Defendants have moved for summary judgment on all counts. Plaintiff contests the motion with regard to his age discrimination and retaliation claims, but has elected to withdraw his disabilities claim. (Plaintiff's Memorandum of Law In Response to Defendant's Motion For Summary Judgment, at 1, n.1.) For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part.

## FACTS[2]

Plaintiff was hired by Oak Brook as a firefighter on June 8, 1973. (Defendants, Village of

---

[1]    The Oak Brook Fire Department ("Department") was at one time named as a Defendant, but Plaintiff's Second Amended Complaint, filed on February 22, 2001, did not include any claims against the Department.

[2]    Facts relevant solely to Plaintiff's abandoned disability claim are not included.

Oak Brook, Oak Brook Fire Department and Chief Debra Jarvis' Statement of Material Facts To Which There Is No Genuine Dispute Pursuant to 56.1(a)(3) (hereinafter, "Defs. 56.1 Stmt.") ¶ 17.) Plaintiff was born on June 23, 1938. (Lindeman Dep., at 7.) He resigned from the Department on June 5, 2000. (Defs. 56.1. Stmt. ¶ 113.) The parties dispute whether or not Plaintiff's resignation was "voluntary." (Id. ¶ 79; Plaintiff's Local Rule 56.1 Statement of Material Facts (hereinafter, "Pls. 56.1 Stmt.") ¶ 79.)

The Department operates in three twenty-four hour shifts, such that each firefighter typically has twenty-four hours on duty followed by forty-eight hours off. (Bodony Dep., at 8-9.) After being promoted to captain by Chief Jarvis late in the fall of 1997, Captain Kovarik became Plaintiff's shift commander. (Kovarik Dep., at 8, 17-18.) Captain Kovarik was born September 4, 1945 and retired from the Department in February 2000. (Id. at 6.) Captain Bodony was Plaintiff's shift commander beginning in 1999, when Plaintiff was assigned to the second, or "red" shift. (Bodony Dep., at 10.) Lieutenant Morton[3] was Plaintiff's direct supervisor in 1997 and 1998. (Kovarik Dep., at 17; Morton Dep., at 7, 13.) It is not clear from the record whether Lieutenant Morton remained Plaintiff's direct supervisor in 1999 or 2000.

The Department is made up of firefighters, firefighter/emergency medical technicians, firefighter/paramedics, lieutenants, captains, and a chief. (Defs. 56.1 Stmt. ¶ 6.) Plaintiff remained a firefighter throughout his twenty-seven years with the Department; he never sought additional training as an emergency medical technician or paramedic, and never applied for a command position. (Id. ¶¶ 7, 9.) Although encouraged to do so, Plaintiff never applied to become a member of one of the Department's specialty teams. (Defs. 56.1 Stmt. ¶¶ 90-91.) Plaintiff is not, however, the only firefighter who has never served on a specialty team, (Pls. 56.1 Stmt. ¶ 174), and he did involve himself with specialty teams in other ways, including attending drills. (Id. ¶ 8.)

Plaintiff's evaluations for the years 1997-1999 show that he was just at the lower end of

---

[3]     Morton was promoted from lieutenant to captain in April 2000. (Morton Dep., at 47-48.) For ease of reference, he will be referred to as "Lieutenant" throughout this opinion.

meeting the requirements for a firefighter, (Defs. 56.1 Stmt. ¶ 89), and Lieutenant Robert Morton found Plaintiff's performance substandard in some areas. (Id. ¶¶ 118-119.) Plaintiff did pass a safe driving class in or around mid- to late-1998. (Pls. 56.1 Stmt. ¶ 198.) On New Year's Eve of 1999, Plaintiff and Caption Bodony served together on a fire call. Reflecting on Plaintiff's capabilities as a firefighter overall through the time they had worked together (presumably including the New Year's Eve fire), Caption Bodony stated,

> I always felt he was a very capable individual. He came to the fire department having served with the Bedford Park Fire Department and seemed highly qualified for his position, and I always perceived [Plaintiff] as a very intelligent individual and enjoyed working with him when we were on shift together as fire fighters.

(Id. at 72; Pls. 56.1 Stmt. ¶ 210.)

On August 27, 1997, Debra Jarvis was appointed Chief of the Department. (Defs. 56.1 Stmt. ¶ 29.)[4] Within a few weeks, Plaintiff had difficulties with the Chief. On September 21, 1997, Plaintiff was reprimanded by Chief Jarvis for failure to respond to an emergency alarm while on duty; Plaintiff had slept through the alarm. (Id. ¶ 30.) On September 30, 1997, Plaintiff was reprimanded by Chief Jarvis for performing electrical work without a permit from the Village of Oak Brook while wearing a Fire Department t-shirt. (Id. ¶ 31.) In or around November 1997, during a discussion regarding the selection of specialty team members, Chief Jarvis remarked to Frank Richter, the chief union steward at the Department, "I don't want old farts on the team." When Richter asserted that seniority governs the selection of specialty team members under the collective bargaining agreement, Chief Jarvis responded, "Well, do you want someone like [Plaintiff] on a team?" (Pls. 56.1 Stmt. ¶ 162 (citing Richter Dep., at 86-87).) Chief Jarvis herself does not remember ever making such a statement. (Jarvis Dep., at 74.)

On January 5, 1998, Captain Kovarik completed Plaintiff's annual written evaluation in which he observed that Plaintiff "appears to be interested in performing no more than the minimum

---

[4]      Chief Jarvis was probably about 48 years old when Plaintiff filed his Second Amended Complaint in February 2001. (See Jarvis Dep., at 9 (stating that she graduated from high school in 1971).)

standards." (Defs. 56.1 Stmt. ¶ 32.)  At that time, Captain Kovarik and Plaintiff discussed the possibility of Plaintiff's joining a specialty team, with Plaintiff expressing his concern that the Department did not want someone at his age on a specialty team and Captain Kovarik assuring Plaintiff to the contrary. (Pls. 56.1 Stmt. ¶ 194; Kovarik Dep. at 31.)  In or around January 1998, subsequent to his evaluation, Plaintiff asked to be considered for the position of Department Safety Representative, but Chief Jarvis rejected his request and instead selected Firefighter Gary Naus. (Pls. 56.1 Stmt. ¶ 183.)[5]

In or around May 1998, Lieutenant Morton told Richter to tell the Plaintiff to watch out because "the chief is out to get him." (Pls. 56.1 Stmt. ¶ 165.)  In June or July 1998, Chief Jarvis indicated to Richter that Plaintiff should retire "with dignity." (Pls. 56.1 Stmt. ¶ 163; Richter Dep., at 95.)  There is no evidence that Richter passed this suggestion along to Plaintiff.

At some point in 1998, Lieutenant Morton shouted at Plaintiff, telling him to straighten up. Plaintiff asked Morton to explain himself, to which Morton replied, "You need to retire already." When Richter interceded to calm Morton, Morton explained in a more apologetic tone, "You have to understand.  You've got to watch what you're doing because the chief ordered me to keep a book on you." (Id. ¶ 164.)[6]  Lieutenant Morton denies telling Plaintiff that he should retire. (Id. ¶ 190.)  On another or possibly the same occasion in 1998,[7] Plaintiff interpreted a comment

---

[5]     At that time, serving as a safety representative may have been seen as tantamount to specialty team membership. (See Grodek Dep., at 27-28, 37 (being on a specialty team used to mean "doing something above and beyond" regular duties, such as acting as shift safety representative).)

[6]     It is undisputed that Chief Jarvis directed Lieutenant Morton to keep a log on Plaintiff. (Pls. 56.1 Stmt. ¶ 189; Defendants' Reply To Plaintiff's Statement of Material Facts ¶ 189.) Lieutenant Morton testified that he was directed to keep a log on "everybody," noting both the good and the bad for use in the Department's regular performance evaluations. (Morton Dep., at 44.)  Lieutenant Morton also testified that he never did keep such a log because the officers reached an agreement with Chief Jarvis that the shift commanders would keep it rather than the individual lieutenants. (Id. at 36.)  Inferences that a finder of fact might naturally make in light of Richter's summary of the incident run counter to Lieutenant Morton's testimony. As such, the court will treat this as a factual dispute.

[7]     It is not clear from the record or the party's filings whether there were two separate
(continued...)

regarding his job performance made by Lieutenant Morton to mean that Lieutenant Morton thought Plaintiff was too old and should consider retirement. (Defs. 56.1 Stmt. ¶¶ 120-122; Pls. 56.1 Stmt. ¶ 188.) Lieutenant Morton denied that he in any way criticized the Plaintiff regarding his age. (Defs. 56.1 Stmt. ¶ 122.) Lieutenant Morton called in Captain Kovarik to help resolve the argument, and the meeting ended with all three men engaging in a group hug to signify resolution of the incident. (Id. ¶ 123.) Captain Kovarik discussed the incident with Chief Jarvis, and noted the basic facts of the exchange between Plaintiff and Lieutenant Morton in Plaintiff's personnel file but does not remember whether or not he placed such a notation in Lieutenant Morton's personnel file. (Pls. 56.1 Stmt. ¶ 195.)[8]

On November 3, 1998, Plaintiff filed his first EEOC charge, alleging that the Department had subjected him to age and disability discrimination dating back to September 1997. (Defs. 56.1 Stmt. ¶ 18-19.) Specifically, Plaintiff alleged that since September 1997, he had been harassed by Oak Brook and subjected to a hostile work environment, and that since May 1998 he had been subjected to different terms of employment such as not being allowed to drive certain vehicles. (Id. ¶ 19; First EEOC Charge, Ex. 2 to Lindeman Dep.)

Chief Jarvis recalls that, throughout the spring of 1999, Plaintiff was restricted to light duty for periods of time by his doctors, and that when light duty was available, she assigned it to him. (Defs. 56.1 Stmt. ¶¶ 92, 93.) In particular, Plaintiff called in sick due to a sore knee on February 6 and 27, 1999. (Id. ¶ 44.) On March 2, 1999, Plaintiff again called in sick because of his knee. (See Lindeman Dep., at 179-80.) He had a doctor's appointment on that same day, after which he

---

(...continued)
exchanges between Plaintiff and Lieutenant Morton, one witnessed by Richter and one resolved by Captain Kovarik, or whether Richter and Captain Kovarik participated in two parts of the same incident.

[8] Captain Kovarik stated that the notation would have been taken out of Plaintiff's file and discarded after Captain Kovarik completed the next annual performance evaluation in January 1999. Thus, presumably neither party was able to ascertain whether Captain Kovarik did in fact make any note of the incident in Lieutenant Morton's file. In addition, Captain Kovarik testified as to what he expected would have happened, not to any personal knowledge that the notation in Plaintiff's file was actually discarded when Plaintiff's next evaluation was completed.

presented a note from Dr. Davison restricting him to light duty for six weeks. (Defs. 56.1 Stmt. ¶ 45.)

At this point, Plaintiff and Chief Jarvis both apparently understood Plaintiff to be on sick leave from full duty, but technically subject to recall for light duty. (*See* Lindeman Dep., at 181.) On March 11, 1999, Chief Jarvis directed Plaintiff in writing to contact Captain Bodony by phone on a regular basis (minimum once per week) to keep Captain Bodony informed regarding his leave status and to receive any instructions or information that Captain Bodony might have for him. (Defs. 56.1 Stmt. ¶¶ 46, 95.) Jarvis's letter noted that Plaintiff had claimed that his knee injury was job-related and had a worker's compensation claim pending. (*See* March 11 letter from Chief Jarvis, Ex. 11 to Lindeman Dep.) (Plaintiff's worker's compensation claim was later denied. (*See* Lindeman Dep., at 181.)) Plaintiff did not return to work at all until sometime after April 13, 1999. (*Id.*)

Around the time of Plaintiff's knee injury, Firefighter George Grodek overheard Chief Jarvis remark to Captain Bodony in reference to Plaintiff, "I wish he'd leave. He's just getting too old." (Pls. 56.1 Stmt. ¶¶ 140, 172; Defs. 56.1 Stmt. ¶ 139.) Grodek does not recall whether he told Plaintiff about Chief Jarvis's statement, (Grodek Dep., at 65), and Plaintiff makes no mention of it in his deposition. During this same time period, Lieutenant Morton directed Grodek to "watch" Plaintiff, and Grodek observed that Plaintiff was the subject of a heightened level of scrutiny among the officers in the Department. (Pls. 56.1 Stmt. ¶ 169 (citing Grodek Dep., at 18-20).)[9] Just prior to his knee injury, Plaintiff had injured his thumb. (Grodek Dep., at 17-18.) Grodek noted that, around the time of these injuries, people in the Department were questioning Plaintiff's ability to drive, and Grodek had a sense of officers trying to evaluate and solicit input regarding Plaintiff's driving and whether he had recovered from his injuries. (*Id.* at 17-20.) In Grodek's view, however,

---

[9]     Defendants have indicated that, for purposes of summary judgment, they do not dispute that Grodek so testified. (Defendants' Reply To Plaintiff's Statement Of Material Facts ¶ 169.)

the heightened scrutiny stemmed from a dislike of Plaintiff, rather than from any legitimate safety or performance concern. (Pls. 56.1 Stmt. ¶ 176.) Grodek stated that Plaintiff was the only firefighter he was ever directed to "watch," by Lieutenant Morton, or presumably any other officer. (*Id.* ¶ 177.) Grodek interpreted the directive to watch Plaintiff as indicative of the administration's desire to discipline and "get rid of" Plaintiff. (*Id.* ¶ 176.) He perceived the disciplinary charges filed against Plaintiff in January 2000 (discussed below) as the culmination of Chief Jarvis's campaign to get rid of the Plaintiff because of his age. (*Id.* ¶ 178.)[10]

On April 9, 1999, Plaintiff was quoted in a local newspaper article regarding a Department vehicle that had been taken out of service for one day for repairs. (*Oak Brook Doings* newspaper article dated April 9, 1999, Ex. 13 to Plaintiff's Memorandum Of Law In Response To Defendants' Motion For Summary Judgment (hereinafter, "Plaintiff's Response").) The article attributed to Plaintiff the following statements: "While removing the truck from service for maintenance or other reasons is not unusual, the willingness to operate below staffing minimums is disturbing;" despite staffing problems, firefighters would have found a way to keep that $450,000 piece of equipment in service in the past; "It's because of the atmosphere present in the department. No one would ever think of doing that three or four years ago under Chief Nielsen;" "[Serious problems in the department] can no longer be shrugged off and blamed on negotiations, lack of a labor contract or just simply denied." (*Id.*) The article also noted that Plaintiff was trying to alert the community that the department has serious problems, and had suggested an impartial review of the situation, including an assessment of Jarvis's performance. (*Id.*)

Chief Jarvis stated that she may or may not have read the article at the time. (Jarvis Dep., at 77.) Plaintiff notes, however, that letters and articles pertinent to or referencing the Department

---

[10] Q. Did it ever come to your attention or do you have any reason to believe that Chief Jarvis in bringing those charges was in any way discriminating against [Plaintiff]?
A. The thought crossed my mind; the reason because of her previous statement of he's getting too old, because of that it was my interpretation that this was the culmination of a -- of a -- of a campaign to get rid of [Plaintiff]. That was my interpretation.
(Grodek Dep., at 65.)

in the *Doings* newspaper were clipped and placed in a file by Chief Jarvis or her secretary, circulated throughout the fire department and placed on a desk for viewing. (Pls. 56.1 Stmt. ¶ 175.) In addition, Chief Jarvis was interviewed for the article. (*Id.* ¶ 186; Jarvis Dep., at 77-78.) Thus, the court will assume that Chief Jarvis knew about the article at the time it was published.

On April 13, 1999, Plaintiff was diagnosed with a torn meniscus in his right knee and his light duty restriction was continued. (Defs. 56.1 Stmt. ¶ 48.) At some point in late April, Plaintiff was called in for light duty by Captain Bodony, at Chief Jarvis's request. (Lindeman Dep., at 85, 183-84.) The light duty assignment lasted three or four days, either including or in addition to a day or two on which Plaintiff called in sick. (*See id.* at 91-92.)[11]

As noted, firefighters at the Department typically work a twenty-four hour shift followed by forty-eight hours off. Light duty assignments, however, are eight hour shifts. (Lindeman Dep., at 87.) Light duty is assigned on an individual basis, when the work is there and to help employees "get back in the swing of things" when the prognosis is that they will be returning to duty. (Jarvis Dep., at 45.) Plaintiff claims that the Department has a practice of giving light duty only to employees injured on the job. (Pls. 56.1 Stmt. ¶ 48.) Chief Jarvis stated that there is no distinction between work-related and non-work-related injuries as a matter of Department policy, but admitted that light duty is typically "use[d] more with worker's comp issues," because employees with worker's compensation injuries are not charged for their sick time, whereas employees injured off duty must use their accrued sick leave. (Jarvis Dep., at 45.) Plaintiff would have preferred to take sick days rather than come in for light duty, and viewed the assignment to light duty as a form of harassment because it caused him to return to work for eight-hour shifts "doing menial clerical tasks." (Lindeman Dep., at 88-89.)

On May 7, 1999, Plaintiff returned to full duty. (Defs. 56.1 Stmt. ¶ 48; Lindeman Dep., at

---

[11] Chief Jarvis stated that she stopped giving Plaintiff light duty because he kept calling in sick. (Jarvis Dep., at 41.) The time-frame is not entirely clear from her testimony, but she seems to be referring to the same period as Plaintiff, late April, although Plaintiff was also apparently given some light duty earlier in 1999 in conjunction with taking a "first responder" class. (*See id.*)

182.) On May 10, 1999, Plaintiff re-injured his knee, and was approved to be off-duty on May 11, 1999. (Lindeman Dep., at 187-90.) On May 12, 1999, Dr. Fragen, the physician employed by the Department to give annual physicals to its firefighters, evaluated the Plaintiff and certified him as physically fit to perform the duties of a firefighter. (Defs. 56.1 Stmt. ¶ 49.) Plaintiff does not view anything about the physical or its timing as harassing or discriminatory. (Lindeman Dep., at 186-87.) With regard to Plaintiff's knee, Dr. Fragen recommended an MRI and that Plaintiff be careful in certain situations. (*Id.* at 188.) Notwithstanding Dr. Fragen's conclusion that he was fit for full duty, Plaintiff does not believe he worked on May 15 or 18, 1999 because he did not want to return to work after his re-injury until speaking to his own doctor. (*Id.* at 190.) On May 18, 1999, Plaintiff's doctor recommended that he get an MRI before returning to work, and wrote a note to that effect which Plaintiff never provided to the Department. (*Id.* at 195.) Plaintiff did not go in for the MRI until July 12, 1999. (*Id.* at 220.) Between May 18 and July 12, 1999, Plaintiff reported for work on occasion despite his doctor's orders, but most of his shifts during that period were covered by vacation days off and other scheduled absences. (*Id.* at 198.)

On July 9, 1999, an orthopedic doctor, Dr. Davison, diagnosed Plaintiff with plantar fasciitis of the right foot and restricted him from work until July 15, 1999. (Defs. 56.1 Stmt. ¶ 50.) On that same day, Plaintiff and Captain Bodony discussed Plaintiff's anticipated sick leave dates in light of his plantar fascitis and imminent MRI on his knee. (Pls. 56.1 Stmt. ¶ 51; Lindeman Dep., at 206.) Captain Bodony recalls having the conversation with Plaintiff after being directed to do so by Chief Jarvis, who was herself following a request from the accounting department. (Bodony Dep., at 43.) Chief Jarvis asked Captain Bodony to request from Plaintiff "a list of the days that he would like to use to be charged for his time off from the job after his sick leave balance was exhausted." (*Id.* at 43-44.)

The Department schedules vacation days during the first part of the year, after which point employees are not allowed to shift vacation time around without approval. (Jarvis Dep., at 37-38.) It appears that, while Plaintiff had accrued time off of various sorts sufficient to cover his absences,

his leave time had already been scheduled for other shifts later in the year. Thus, the Department was attempting to reschedule Plaintiff's time off to coincide with the unscheduled time off he was actually taking. Captain Bodony needed information from Plaintiff to complete the shift schedule and post the shifts made available so other firefighters could sign up ahead of time to work overtime voluntarily, rather than having to fill in on short notice and possibly against their will. (Bodony Dep., at 46-47; *see also* Lindeman Dep., at 291-92.) Captain Bodony also noted that, "not knowing the disposition of [Plaintiff's] return to work and/or the payroll problems of associating his days off with days that he had pre-selected to be off for the rest of the year, it made it difficult for us to complete his payroll." (Bodony Dep., at 46-47.)

Bodony spoke to Plaintiff about this matter on July 9. Regarding this conversation, Plaintiff stated, "I provided [Captain Bodony] with an understanding of my situation and the possibility that the outcome of my MRI [scheduled for July 12] would determine whether the days at the end of the holiday period . . . in September, should be used or whether more recent earlier days should be designated."

In a memorandum dated July 12, 1999, Captain Bodony directed Plaintiff to provide him with a list of the vacation, holiday and/or personal days Plaintiff intended to use to cover his sick leave by July 15, 1999. (Memo dated July 12, 1999, Ex. 10 to Plaintiff's Response; Defs. 56.1 Stmt. ¶¶ 51-52.) The memorandum stated in its entirety as follows:

> Per our conversation on Friday, July 9, 1999, you are aware that you are near to exhausting your accumulated sick leave. At the start of our duty shift today, you had a sick leave balance of 11.25 hours remaining. As such, in compliance with section 9.8 of the current contract, you must exhaust your accumulated vacation, holiday and personnel [*sic*] time to avoid any break in compensation, pension and benefits. The record currently reflects a balance of nine (9) vacation days, nine (9) holidays and one (1) personal day remaining in your leave account. After you have exhausted your time off bank, you may apply for leave under the contract provisions of section 9.6 "Family and Medical Leave Act".
>
> At this time I need a list of the days off that you would like to use to cover your current time off. Please submit the list to me in the order that you would like them used and have it to me by 0730 hours on our next duty day, July 15th, so that I can forward that information to the accounting department later in the day.

I have attached a copy of your 1999 Employee Attendance Record to assist you in selecting the days off you would like to use to cover you[r] leave.

(*Id.*) Plaintiff does not recall when he actually received this memorandum, but believed that by the time he did, he and Captain Bodony had already reached an understanding about the matters it raised in their conversation on July 9, 1999. (Pls. 56.1 Stmt. ¶ 51.) Plaintiff had told Captain Bodony, "I was scheduled for an MRI on the 14th[12] and until I resolved that I didn't feel I could designate any specific days off because I may require, you know, considerable time off or I may be able to return immediately." (Lindeman Dep., at 201-202.)

On July 15, 1999, Plaintiff called in his absence to work, and informed Lieutenant Morton at that time that he (Plaintiff) had fully apprized Captain Bodony of the reason for his absence. (Pls. 56.1 Stmt. ¶ 53.) Defendants take the position that Plaintiff failed to comply with Captain Bodony's "order." (Defs. 56.1 Stmt. ¶ 53.) Plaintiff, on the other hand, states that he provided all the information he had available at the time to Captain Bodony in their July 9 conversation, prior to receiving the July 12 memorandum, and viewed the memorandum as a formality following up on what had previously been resolved. (Pls. 56.1 Stmt. ¶¶ 51, 53.) It is not clear what kind of time off was applied to cover Plaintiff's absence on July 15, but he had days off scheduled for July 21, 24, 27 and 30, 1999, as well as numerous others scheduled in August and September. (Lindeman Dep., at 221.)

On July 30, 1999, Chief Jarvis faxed a written order to Plaintiff in which she noted that Plaintiff had "not responded to [Captain Bodony's] July 12th letter;" directed Plaintiff to contact Captain Bodony that day to advise Bodony of Plaintiff's status; directed Plaintiff to either return to work with a physician's release by August 5, 1999 or provide a letter indicating a continued restriction from work; contact the shift commander each red shift day (*i.e.*, every third day) to advise him of Plaintiff's status; and cautioned that she would bring charges for insubordination against

_____

[12] Plaintiff later testified that his MRI appointment was actually on July 12. (*See* Lindeman Dep., at 220.)

Plaintiff should he fail to comply with these directives. (Letter dated July 30, 1999 from Chief Jarvis to Firefighter Lindeman, Ex. 11 to Plaintiff's Response; Defs. 56.1 Stmt. ¶¶ 54, 58, 97-99.) Plaintiff did not respond to Chief Jarvis's order to contact Captain Bodony on July 30 because Plaintiff was out of town[13] and did not receive the fax from Chief Jarvis until August 1, 1999. (Defs. 56.1 Stmt. ¶ 55; Pls. 56.1 Stmt. ¶ 55.)

On August 2, 1999, Plaintiff reported for work as scheduled and requested a conference with Captain Bodony and Chief Jarvis to discuss his situation and the matters raised in the Chief's July 30 letter. (Pls. 56.1 Stmt. ¶ 59; Lindeman Dep., at 235-37.) The three met on that day and discussed what vacation time should be used to compensate for Plaintiff's having used up all of his sick time. (Pls. 56.1 Stmt. ¶¶ 59, 205.) Notwithstanding his statement that the July 30 letter was not distributed or discussed, though the subject matter of the letter may have come up, (Lindeman Dep., at 284), Plaintiff argues that he believed this conference "rendered moot the matters raised in Chief Jarvis'[s] July 30, 1999 facsimile due to the understanding reached that Plaintiff's situation would not change shift day to shift day until his next doctor's appointment shed more light on his condition." (Pls. 56.1 Stmt. ¶ 59.) Plaintiff's next doctor's appointment at that point was scheduled for September 1, 1999. (Lindeman Dep., at 261.) On August 4, 1999, Plaintiff again called in sick and advised that the remainder of his vacation and holiday time should be scheduled due to his knee injury. (Pls. 56.1 Stmt. ¶ 59.)

At some point while Captain Bodony was still trying to get Plaintiff to provide him with scheduling information, Captain Bodony and Firefighter Naus stopped at Plaintiff's home on the way back from a call. The weather was warm, and Captain Bodony reminded Plaintiff that he really needed a list indicating the days Plaintiff wanted to take off the calendar so that his pay would not be interrupted. Captain Bodony remembers the conversation as casual and social, and Plaintiff

---

[13]    He was operating a paint ball business at the Kankakee County Fair. (Lindeman Dep., at 233-35.) Plaintiff made four trips during the summer of 1999 to operate his paint ball business. (*See id.* at 241-42.)

assured the Captain that he would provide the requested information. (Pls. 56.1 Stmt. ¶ 208; Bodony Dep., at 65-67.) Precisely when this occurred is not in the record.

On August 17, 1999, Chief Jarvis issued a written order to Plaintiff stating, "Captain Bodony advised me that you have not contacted him each red shift as directed in my memo of July 30. *You are directed to contact Captain Bodony today* and each red shift you are not here regarding your back to work status." (Letter dated August 17, 1999 from Chief Jarvis to Firefighter Lindeman, Ex. 12 to Plaintiff's Response.)  The Chief's letter also highlighted the importance of the Department's being able to schedule the appropriate overtime to cover Plaintiff's absences but made no direct reference to Captain Bodony's July 12 memorandum. (*Id.*; Defs. 56.1 Stmt. ¶ 61; Pls. 56.1 Stmt. ¶ 60.)  Captain Bodony took no part in authoring Chief Jarvis's August 17 memorandum to Plaintiff. (Pls. 56.1 Stmt. ¶ 207.)

On August 19, 1999, Oak Brook placed Plaintiff on leave of absence pursuant to the Family Medical Leave Act (FMLA), pending Plaintiff's providing Oak Brook with medical certification for FMLA leave. (Defs. 56.1 Smt. ¶ 64.) That day, the assistant Village Manager sent Plaintiff a letter advising him of his FMLA leave status and requesting that medical certification of Plaintiff's condition be provided no later than August 27, 1999. (*Id.* ¶¶ 65, 102; August 19 Letter, Ex. 29 to Lindeman Dep.)

On August 24, 1999, Plaintiff responded to the August 17 letter from Chief Jarvis and the August 19 FMLA letter by calling Chief Jarvis to tell her that he would see a doctor on August 31, 1999. (Defs. 56.1 Stmt. ¶¶ 66, 101; Jarvis Dep., at 33, 38-39.) Chief Jarvis recalled that Plaintiff told her in the August 24 conversation that he had just got back from out of town. (Defs. 56.1 Stmt. ¶ 101.)[14](Pls. 56.1 Stmt. ¶ 101.)  Out of town or not, the record indicates that Plaintiff did not contact anyone regarding Chief Jarvis's August 17 Letter or the August 19 FMLA letter at any time prior to August 24, 1999. (*See* Lindeman Dep., at 298.)

---

[14]     Plaintiff challenges this assertion as hearsay, but the court assumes Defendants have not offered the statement for its truth.

Plaintiff gave the FMLA form to his doctor on September 1, 1999, but for reasons unexplained by the record, his doctor never provided a completed version to Oak Brook. (Defs. 56.1 Stmt. ¶ 67; Lindeman Dep., at 304-05.) Plaintiff never submitted the FMLA certification as had been requested in the August 19 FMLA letter, nor did he follow the orders contained in Chief Jarvis's August 17 Letter, to contact Captain Bodony that day and each red shift. (Defs. 56.1 Stmt. ¶ 103.)[15]

On November 1, 1999, Chief Jarvis ordered Plaintiff to return to duty no later than November 6, 1999. (Defs. 56.1 Stmt. ¶ 69; November 1 Order, Ex. 31 to Lindeman Dep.) The November 1 Order in its entirety stated as follows:

> Our most recent doctor's slip from your physician dated July 9, 1999 indicated that you could return to full duty after July 15th. You did not return. On July 30th and again on August 17th you received letters from me advising you to provide a letter from your physician with an anticipated return to work date. In addition, you were advised in both letters to contact Captain Bodony on each red shift day to update him on your status. We have received no correspondence from your doctor and Captain Bodony has not received any phone calls from you as directed, nor have you returned recent messages he has left for you. Your failure to follow the previously referenced orders constitutes insubordination.
>
> Effective August 26th you exhausted all sick time, vacation, holiday, and personal leave. Accordingly you were placed on unpaid leave. You also failed to provide the necessary paperwork to determine whether any illness or injury that you might have is FMLA qualifying as requested in Assistant Village Manager Michael Crotty's August 19th memo to you. Accordingly you are absent without leave. *You are hereby ordered to return to duty no later than Saturday, November 6, 1999 at 7:30 a.m. Failure to do so will leave me with no alternative, but to file charges with the Board of Fire and Police Commissioners to seek your dismissal.*

(November 1 Order, Ex. 31 to Lindeman Dep.) Plaintiff disputes that he failed to follow prior orders and that his behavior was insubordinate, (Pls. 56.1 Stmt. ¶ 104), but admitted in his deposition that he did not contact Captain Bodony every red shift and did not provide the medical documentation requested. (Lindeman Dep., at 317-320, 323.)

---

[15] Plaintiff disputes the cited paragraph in Defendants' 56.1 Statement, but only the use of "refused" to characterize his failure to follow Chief Jarvis's direct orders. (Pls. 56.1 Stmt. ¶ 103.) It is thus undisputed that Plaintiff did not contact Captain Bodony on August 17, 1999 nor each red shift day. (*See* Lindeman Dep., at 296, 323.)

Although Plaintiff was not certain that the FMLA forms were ever turned in by his doctor, there was no indication from the village that they had *not* been received. (Lindeman Dep., at 305.) Chief Jarvis's November 1 letter appears clear on the point, (*see* language quoted above), but Plaintiff claims he did not know that his doctor failed to provide the paperwork until February 2000 when Chief Jarvis added being absent without leave to the charges filed against him (discussed below). (*Id.* at 308.) With regard to checking in with Captain Bodony on every red shift, Plaintiff apparently concluded that the direction was an expression of the Department's desire to cover his absences with overtime work by other firefighters, as necessary. (*Id.*, at 286.) As such, Plaintiff felt that once he was on FMLA leave, the Department had all the information it needed and, since there was no provision in the FMLA requiring it, he saw no need to check in every third day. (*See id.* at 285-86, 317-18.)

On November 6, 1999, Plaintiff returned to work as Chief Jarvis had ordered. (Defs. 56.1 Stmt. ¶ 70.) On November 9, 1999, Captain Bodony gave Plaintiff a verbal warning for deviating from an assigned task by driving on the tollway to observe another crew working on an incident. Captain Bodony documented the incident in a memorandum which was ultimately attached to a personnel action report signed by Chief Jarvis. (*See* Ex. 32 to Lindeman Dep.; Pls. 56.1 Stmt. ¶ 71; Defs. 56.1 Stmt. ¶ 71.) On November 9, 1999, Plaintiff complained of a problem with his foot and had a Department paramedic look at it. (Lieutenant Vassios Memorandum of November 9, 1999, Ex. 33 to Lindeman Dep.) Plaintiff then took himself to the hospital where he was diagnosed with right toe cellulitis and placed on restriction from working until November 11, 1999. (Defs. 56.1 Stmt. ¶ 72.) On November 12, 15 and 18, 1999, Plaintiff called in sick due to continuing problems with his foot. (*See* Exs. 35, 38 to Lindeman Dep.)

On November 18, 1999, Captain Bodony provided to Chief Jarvis a letter summarizing "the disciplinary actions taken against Firefighter William Lindeman since 1996, as well as a record of recent actions taken by Firefighter Lindeman that require action on our part." (November 18 Letter, Ex. 37 to Lindeman Dep.) The past disciplinary actions listed by Captain Bodony all predated Chief

Jarvis's tenure as chief. (*See id.*) Captain Bodony summarized Plaintiff's "recent actions" as follows:

> During the past year, Firefighter Lindeman has disobeyed direct orders on several occasions, in violation of Article XIV, Section 2 of the Fire Department Rules and Regulations. On July 12, 1999, I wrote a memo to F.F. Lindeman regarding his sick leave. In the memo, I directed him to provide me a list of his unused days off to be applied to cover for his extended medical leave. A list was never provided despite repeated requests by me to him. On July 30, 1999, you wrote F.F. Lindeman a memo outlining his leave balance, and contained in the memo was a directive for him to contact the shift commander each red shift date to advise of his status. This directive was not obeyed. On August 17, 1999, you wrote a memo to F.F. Lindeman again directing him to contact me that date and every red shift day regarding his back to work status. This directive was not obeyed. It should be noted that in his December 31, 1998 Employee Performance Appraisal, F.F. Lindeman was counseled for a poor attitude regarding his reluctance to keep his shift commander, Captain Kovarik, apprized of his injury status and of his return to work status.

(*Id.*) Captain Bodony prepared the November 18 letter at the request of Chief Jarvis based on information contained in Plaintiff's personnel file. (Pls. 56.1 Stmt. ¶ 206.) According to Captain Bodony, Chief Jarvis directed him to submit to her a "summary from the disciplinary actions and infractions that were contained in [Plaintiff's] personnel file," without telling him why she wanted it done. (Bodony Dep., at 61; Pls. 56.1 Stmt. ¶ 206.)[16]

Early in the morning of November 21, 1999, prior to a scheduled shift, Plaintiff visited the emergency room because he was concerned that the healing of his knee had not progressed to the point that he was ready to return to duty. (Pls. 56.1 Stmt. ¶ 73.) Plaintiff was restricted from work by Dr. Mayor, an emergency room physician, for two days. (*Id.*; November 21 Doctor's Instructions, Ex. 39 to Lindeman Dep.)

On December 21, 1999, Plaintiff was evaluated for the year 1999 and given a rating of "needs improvement." (Defs. 56.1 Stmt. ¶ 74; Employee Appraisal, Ex. 43 to Lindeman Dep.) He received a score of 1 (Below Standards) on a scale of 0-5 in the attitude category. The details

---

[16]    Chief Jarvis had a different recollection concerning the reasons for this letter. She testified, "I honestly don't know" why Captain Bodony sent the November 18 letter, "other than the fact that we had had some conversations about [Plaintiff's] performance and [Captain Bodony] was concerned and he simply summarized his concerns in the form of a memo." (Jarvis Dep., at 63.)

recorded by Captain Bodony for this section of Plaintiff's review are as follows:

> FF Lindeman has displayed an increasingly poor attitude towards the Department
> and his obligations as a member. Despite several warnings during his recent
> lengthy time off due to injury, he neglected to keep the shift commander informed
> each shift as to his status, as directed. During last years performance appraisal,
> this same issue was brought up and an action plan was established to issue
> compliance with department policies. In addition, FF Lindeman has displayed a
> negative attitude toward compliance with orders and directives. When corrected in
> his method of completing his time sheet, he continued to violate department policy
> in the method in which he completed his time sheet. On December 13, 1999, FF
> Lindeman was called to Station #1 after his shift because he had failed to complete
> his time sheet properly. When instructed by the shift commander on how to correct
> his error, he became belligerent and questioned the reasons behind his instructions.
> He left without following his instructions and the Administrative Assistant made the
> corrections. FF Lindeman has shown an increasing lack of enthusiasm towards his
> position in the Department. On December 15th, during shift training, he fell asleep
> in class at least four times. Despite his many years of employment, he continues
> to make mistakes in completing many tasks, even those of a simple nature such as
> grocery shopping and running errands. FF Lindeman at times displays an
> antagonistic attitude toward the Department and the Village. This type of situation
> must stop in order for him to become a productive employee.

(Employee Appraisal, Ex. 43 to Lindeman Dep., at 3-4.)

On January 3, 6, and 13, 2000, Plaintiff was involved in disputes with his co-workers. (Defs.
56.1 Stmt. ¶ 75 (citing January 15, 2000 Memorandum from Lieutenant Morton to Captain Bodony
Re: Confidential Report Regarding FF Lindeman, Ex. 45 to Lindeman Dep.).)[17] As discussed
above, Firefighter Grodek linked the directive from Lieutenant Morton to "watch" Plaintiff and a
general sense of heightened scrutiny to the time period around Plaintiff's knee injury. (See Grodek
Dep., at 17-20.) Nonetheless, Grodek also testified that the January 13 incident "got blown out of
proportion in my opinion, and when that happened, that's when I became aware that people were
watching [Plaintiff] more intently than others." (Id. at 38-39.)

On January 14, 2000, Captain Fleishman sent a memorandum to Chief Jarvis and Captain
Bodony detailing a verbal warning he had given Plaintiff on December 31, 1999 for smoking in an
area designated non-smoking while on overtime duty. (See Defs. 56.1 Stmt. ¶ 76 (citing Personnel

---

[17]     Plaintiff disputes this point on the ground that Lieutenant Morton's memorandum is
hearsay evidence. (Pls. 56.1 Stmt. ¶ 75.) He acknowledges, however, that the incidents in fact
occurred. (See Lindeman Dep., at 368-73.)

Action Report and January 14, 2000 Memorandum from Captain Fleishman, Ex. 44 to Lindeman Dep.).)[18] Plaintiff did not object to receiving the warning itself, but felt there was "something wrong . . . that [the memo] was prepared January 14th for an incident that occurred December 31st." (Lindeman Dep., at 367.)

On January 26, 2000, Chief Jarvis filed formal charges recommending Plaintiff's termination. (Defs. 56.1 Stmt. ¶ 77.) Chief Jarvis charged that Plaintiff was insubordinate, and in February 2000 added a charge of absent from assigned duty without permission from proper authorities based on Plaintiff's conduct from July 12, 1999 until his return to work November 6, 1999, as described above. (Id. ¶ 111; see also Statement of Charges, Ex. 48 to Lindeman Dep.) Chief Jarvis also prepared and submitted a three-page document supplementing the disciplinary charges entitled, Aggravation of Charges. (Pls. 56.1 Stmt. ¶ 181.) As discussed above, Firefighter Grodek perceived the disciplinary charges filed against Plaintiff in January 2000 as the culmination of Chief Jarvis's campaign to get rid of the Plaintiff because of his age. (Id. ¶ 178.)[19] Plaintiff never asked the union to get involved in the charges being brought against him, (Defs. 56.1 Stmt. ¶ 154), but at some point between January 26 and June 5, 2000, he did express to Chief Jarvis reasons the charges should not be levied against him. (Pls. 56.1 Stmt. ¶ 180.) Captain Bodony expressed to Chief Jarvis his feeling that "it was unfortunate that we had to go to this extent in regard to handling the matters involved." (Bodony Dep., at 68; Pls. 56.1 Stmt. ¶ 209.) Captain Bodony also noted that he lacked the authority to question Chief Jarvis's decision to bring charges against Plaintiff, (Pls. 56.1 Stmt. ¶ 209), but it is not clear whether Captain Bodony actually disagreed with the decision.

On June 5, 2000, prior to a hearing on the charges against him scheduled for that day, Plaintiff resigned from his position, effective midnight of June 5, 2001. (Defs. 56.1 Stmt. ¶ 113.)

---

[18]     Plaintiff disputes this point on the ground that the support cited by Defendants is hearsay evidence. (Pls. 56.1 Stmt. ¶ 76.) He acknowledges, however, that the incident in fact occurred. (See Lindeman Dep., at 367-68.)

[19]     See Note 10, supra.

The parties dispute whether or not Plaintiff's resignation was "voluntary." (*Id.* ¶ 79; Pls. 56.1 Stmt. ¶ 79.)

In addition to the events and incidents discussed above, several comments were made in reference to Plaintiff's age or retirement, but the dates and times are not set forth in the record. During a conversation in which Firefighter Robertson expressed to Chief Jarvis his desire to drop paramedic status, Chief Jarvis told him that the Department needs all the paramedics it can get. Robertson suggested, "How about sending [Plaintiff] to paramedic school, Chief?" To which Chief Jarvis responded, "No, he's too old." (Pls. 56.1 Stmt. 166; Defs. 56.1 Stmt. 133.) Captain Kovarik asked Richter to tell Plaintiff to be careful because Chief Jarvis had told Captain Kovarik to report back anything pertaining to Plaintiff. (Pls. 56.1 Stmt. ¶ 167.) Presumably Richter passed along this warning, but the record does not say one way or the other. In addition, Captain Bodony, Gary Naus (a firefighter and President of the Pension Board) and Firefighter Jim Zamboni all commented to Richter that Plaintiff should think about retiring. (Defs. 56.1 Stmt. ¶¶ 158-160.) Lieutenant Morton has discussed the matter of Plaintiff's age with Chief Jarvis in reference to Plaintiff's ability to perform his job. (Pls. 56.1 Stmt. ¶ 187.)

On September 15, 2000, Plaintiff filed a second charge with the EEOC in which he alleged that his scheduled return date from medical leave was November 20, 1999,[20] that after being ordered back to work on November 6 he was subjected to different terms and conditions of employment, in violation of the ADEA and in retaliation for his having filed the first EEOC Charge on November 3, 1998, and that he was constructively discharged on June 5, 2000. (Defs. 56.1 Stmt. ¶¶ 39-42.)

---

[20] The November 20, 1999 date was apparently based on Plaintiff's understanding that FMLA leave is for 12 weeks, (*see* Lindeman Dep., at 321), but there is no indication that this date was the product of any agreement or discussion between Plaintiff and Department officers.

## DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Cianci v. Pettibone Corp.*, 152 F.3d 723, 726 (7th Cir. 1999). Summary judgment is appropriate in an employment discrimination case "only if the [moving party] would have been entitled to a directed verdict had the record before the court been that of a trial – in other words, only if judgment as a matter of law would have been appropriate because no reasonable jury could have returned a verdict for the plaintiff." *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397, 1402 (7th Cir. 1996). The court will construe the evidence in the light most favorable to the non-movant, giving him the benefit of all reasonable inferences. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001).

Under the Age Discrimination in Employment Act, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To succeed in an ADEA claim, a plaintiff must establish that he would not have received adverse treatment but for his employer's motive to discriminate on the basis of his age. *Fuka*, 82 F.3d at 1402.

To avoid summary judgment in an employment discrimination case, a plaintiff must either put in enough direct evidence of discriminatory motivation to create an issue for trial, or establish a prima facie case of discrimination under the indirect method of shifting burdens set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Fuka*, 82 F.3d at 1402. Under either method, summary judgment is improper if the plaintiff offers evidence from which an inference of age discrimination may be drawn. *Id.* at 1402-03. Alternatively, under the "mixed motive" approach, if plaintiff establishes discriminatory intent through direct or circumstantial

evidence, the employer bears the burden of proving that it would have made the same decision even if the plaintiff had not been within the protected class. *See Abioye v. Sundstrand Corp.*, 164 F.3d 364, 369 (7th Cir. 1998).

To succeed on a hostile work environment claim the plaintiff must show that the harassment of which he complains was subjectively hostile, and objectively so severe or pervasive as to alter the conditions of his employment and create an abusive working atmosphere. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). The plaintiff must also show a connection between age discrimination and the harassing conduct. *See Bennington*, 275 F.3d at 660. The standard for a constructive discharge claim is even higher than for a hostile work environment because employees are generally expected to remain employed while seeking redress. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). To establish constructive discharge under the ADEA, a plaintiff must show that his working conditions were so intolerable that a reasonable person would have been compelled to resign, and that they were intolerable because of impermissible age discrimination. *See Bennington*, 275 F.3d at 660.

A claim under § 1983 for retaliation in violation of the First Amendment requires a three-step analysis. First, the court must determine whether the plaintiff's speech was constitutionally protected. If so, then the plaintiff must prove that the defendant's actions were motivated by the plaintiff's constitutionally protected speech. Finally, if the plaintiff can demonstrate that his constitutionally protected speech was a substantial or motivating factor in the defendant's actions, the defendant is given the opportunity to demonstrate that it would have taken the same action in the absence of the plaintiff's exercise of his rights under the First Amendment. *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999).

## B.   Plaintiff's Claim of Age Discrimination in Terms and Conditions of Employment

Plaintiff claims that, because of his age, he was subjected to adverse terms and conditions of employment culminating in his constructive discharge, and to a hostile work environment prior

to discharge. (*See* Plaintiff's Response, at 6.) Plaintiff asserts that he was subjected to this harassment and discrimination as part of a campaign by Chief Jarvis to rid the Department of Plaintiff because of his age. (*Id.* at 2-3.)

Plaintiff has three particular claims of adverse treatment. First and foremost, he views being subjected to disciplinary charges and impending termination as harassment. (Pls. 56.1 Stmt. ¶¶ 59, 78.) Second, Plaintiff apparently views being given light duty assignments after his knee injury in the spring of 1999 (rather than being allowed to use accrued sick time) as discriminatory because light duty assignments were reserved for workmen's compensation candidates only, and Captain Bodony had advised Plaintiff that light duty would not be recommended in his case. (Pls. 56.1 Stmt. ¶¶ 48, 93.) Third, Plaintiff views the requirement that he contact Captain Bodony on each red shift during the summer and fall of 1999 as having been harassing and discriminatory. (*Id.* ¶ 62.)

It is worth noting several things that Plaintiff is *not* claiming. As Defendants point out, Plaintiff does not claim that he was discriminated against by being kept off specialty teams or denied paramedic training. (Defendants' Reply, at 2.) Plaintiff also fails to argue that any particular incidents prior to his knee injury in the spring of 1999 constitute adverse treatment. (*See id.* at 1.) This would include the reprimands Plaintiff received in September 1997, Chief Jarvis's rejection of his request to be considered for the position of Department safety representative, and any claim about not being permitted to drive certain fire department trucks.

Plaintiff argues that he has presented both direct and indirect evidence that the adverse employment actions to which he was subjected were motivated by age discrimination. (*See* Plaintiff's Response, at 2-3.) The court addresses each in turn, followed by an analysis of Plaintiff's claims under the mixed motive approach.

### 1.    Direct Evidence Analysis

Although the term is subject to a number of interpretations, the Seventh Circuit has most recently defined direct evidence as "evidence that can be interpreted as an acknowledgment of

discriminatory intent by the defendant or its agents." *Bennington*, 275 F.3d at 659, n.1 (quoting *Hill v. Burrell Comm. Group*, 67 F.3d 665, 667 (7th Cir. 1995)); *see also Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 629 (7th Cir. 1996) (giving as an example of direct evidence an employer's statement that, "I did not hire you because you are a woman"). Such evidence is of a sort that, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). Stray workplace remarks in particular are evidence of discriminatory intent only when made by "the decision makers themselves, or those who provide input into the decision, [and] express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000)

The record certainly shows that comments were made about Plaintiff's age and that Plaintiff was the subject of heightened scrutiny around the time of his knee injury and/or just prior to charges being filed against him in January 2000. It also shows that he was involved in at least one altercation with Lieutenant Morton that Plaintiff perceived to be age-related. (See Pls. 56.1 Stmt. ¶¶ 164, 188.) Viewed strictly, Chief Jarvis's remarks that she did not want "old farts" on specialty teams, and that Plaintiff was too old for paramedic school, (*Id.* ¶¶ 162, 166), might be characterized as direct evidence of charges Plaintiff has not made – *i.e.*, that he was barred from specialty team participation and paramedic school on the basis of his age. Even Firefighter Grodek's testimony that Chief Jarvis remarked in reference to Plaintiff, "I wish he'd leave. He's just getting too old," (*id.* ¶¶ 140, 172), does not establish that anything Chief Jarvis actually did was motivated by that desire. The comment makes no reference to any of the particular adverse employment actions of which Plaintiff complains. Still, Plaintiff has introduced evidence that Chief Jarvis expressed her desire to rid the Department of Plaintiff due to his age. The court concludes Defendants have not shown there are no disputes of fact on this issue.

### 2.    Burden-Shifting Analysis

In the absence of direct evidence, the court would devote greater attention to the *McDonnell*

23

*Douglas* indirect method of proof. Under that method, plaintiff must establish a prima facie case of discrimination and show that any legitimate, non-discriminatory reasons presented by the defendant-employer are a pretext. *See Richter v. Hook-Superx, Inc.*, 142 F.3d 1024, 1028 (7th Cir. 1998); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).[21] Defendants here argue the reasons they have advanced for the adverse actions in the case themselves prevent the Plaintiff from meeting his initial burden or establishing pretext. Defendants note that the disciplinary charges and impending termination to which Plaintiff was subjected "stem[med] from a series of occasions on which [Plaintiff] refused to follow direct orders from his superior officers." (Defs. 56.1 Stmt. ¶ 43; *see also* Defendants, Village Of Oak Brook, Oak Brook Fire Department and Chief Debra Jarvis', Memorandum Of Law In Support Of Their Motion For Summary Judgment (hereinafter, "Defendants' Memorandum"), at 8-10.) Defendants assert that Plaintiff voluntarily resigned rather than answer these legitimate charges against him. (Defs. 56.1 Stmt. ¶ 79; Defendants' Memorandum, at 10.) Albeit in the context of rebutting Plaintiff's abandoned disability discrimination claim, Defendants contend that Plaintiff was given light duty when it was available in accommodation of his doctor's note restricting him to same. (*See* Defendants' Memorandum, at 5.)[22] Defendants justify the requirement that Plaintiff contact Captain

---

[21]     The indirect method was formulated for Title VII cases and the Supreme Court has never squarely addressed its applicability to ADEA claims, *Reeves*, 530 U.S. at 142, though its applicability was assumed most recently in *Swierkiewicz v. Sorema N. A.*, 122 S.Ct. 992 (2002). The Courts of Appeals, including our own, have by and large applied the *McDonnell Douglas* framework to age discrimination cases. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, n.2 (1996) (listing cases); *LaMontagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409, n.1 (7th Cir. 1984).

[22]     Defendants do not directly confront Plaintiff's assertions that, "light duty had never been given to employees unless their injury was workmen's compensation related, and . . . Captain Bodony advised Plaintiff that he was not recommending any light duty for Plaintiff." (Pls. 56.1 Stmt. ¶ 48.) Chief Jarvis actually provided reasons why light duty was typically used more for worker's compensation cases. The court notes, however, that Plaintiff's arguments go to whether the assignment was adverse, not whether Defendant had a legitimate reason for assigning Plaintiff, an employee restricted to light duty by his doctor, to light duty. Plaintiff explained that he would have preferred to stay at home and use his sick leave rather than be given a light duty assignment. Plaintiff's objection to light duty is unusual; in most cases, such assignments are viewed as favorable treatment because they enable an employee whose medical restrictions might otherwise
(continued...)

Bodony each red shift as part of an effort to ensure the safety of the community by keeping the Department properly staffed and maintained. (Defs. 56.1 Stmt. ¶ 107; Defendants' Memorandum, at 10.) They urge that Plaintiff does not offer evidence that these stated reasons for Defendants' actions are not worthy of belief, or that the real reason for the adverse actions was age.

In *Fuka v. Thomson Consumer Electronics*, where the plaintiff was fired for abusing her telephone privileges, she was unable to contest the factual basis of defendant's charges in the face of phone records and her own admissions that she had been counseled about her personal phone use on a number of occasions. 82 F.3d at 1405. Plaintiff attempted to show that her personal use of the phone had not affected her job performance, but the court concluded that the fact she was able to perform her job did not make her violation of company policy a pretext and that plaintiff failed to show that younger employees were not in fact treated more favorably. *Id.* The court concluded, further, that managers' stated preference for *hiring* younger workers did not constitute direct evidence that plaintiff's *discharge* was unlawful. *Id.* at 1404.

The situation here is similar in some respects. Plaintiff argues that the charges brought against him in January 2000 were the culmination of "the course of action [Chief Jarvis] instituted against Plaintiff in order to give effect to her expressed goal of ridding the department of Plaintiff." (Plaintiff's Response, at 4.) Notwithstanding his own explanations for his actions, however, Plaintiff cannot contest the factual basis underlying Defendants' claims because the record shows unequivocally that Plaintiff did not follow the orders he was given. (Defs. 56.1 Stmt. ¶ 103; Pls. 56.1 Stmt. ¶ 103; Lindeman Dep., at 317-20, 322-23.)

It is undisputed that, "[y]ounger as well as older employers are required to provide doctor's notes and to follow the Chief's orders to report to the shift commander." (Defendants' Memorandum, at 8 (citing Defs. 56.1 Stmt. ¶¶ 124, 132, 148).) It is also undisputed that, upon

---

(...continued)
disqualify him to continue working. If Plaintiff had not had leave accrued, he may well have welcomed the light duty assignments insofar as they would have allowed him to continue receiving his paycheck.

issuing disciplinary action to any firefighter, Chief Jarvis considers that firefighter's past performance evaluations and that firefighter's history of disciplinary action. (Defs. 56.1 Stmt. ¶ 110.) The court's task would have been far more straightforward if either party had provided some account of the treatment given younger employees in similar circumstances, or any Department policies beyond the basic one that employees are to comply with the orders of their superiors. If there were no direct evidence of Chief Jarvis's alleged age-based animus, Plaintiff would have difficulty surviving summary judgment as there is extensive evidence that he disobeyed orders given to him during the summer of 1999 and was in fact absent without leave.[23] Defendants have also presented rational reasons for giving light duty to the Plaintiff and for making him check in every red shift. In short, using only the traditional burden-shifting analysis, Plaintiff would likely be unable to establish pretext because there is no evidence that the proffered reasons are factually baseless. *See Fuka*, 82 F.3d at 1404.

### 3. Mixed Motive Analysis

As described above, Defendants have presented legitimate reasons, with ample support in the record, for bringing charges against Plaintiff, giving him light duty, and ordering him to check in regularly with Captain Bodony. Plaintiff's inability to show that the legitimate reasons did not play some role does not mean, however, that tainted motives did not also motivate Defendant's actions. Where there is evidence that Chief Jarvis wanted to rid the Department of him because of his age, the court is reluctant to conclude that her age-based animus did not, at least in part, motivate the adverse actions of which Plaintiff complains.

Neither party has discussed the "mixed motive" doctrine, but the court notes its applicability in this case. Under the mixed motive approach, first enunciated in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), if the plaintiff establishes discriminatory

---

[23]     Chief Jarvis noted that she first contemplated bringing charges seeking Plaintiff's termination in July 1999. (Jarvis Dep., at 64.) She continued to consider bringing charges against him through the early part of November, but was "in the throes of Y2K planning, so it was postponed." (*Id.*)

intent through direct or circumstantial evidence, he shifts to the employer the burden of proving that it would have made the same decision even if the plaintiff had not been over a certain age. *See Abioye*, 164 F.3d at 369. "If there are two motives, each sufficient to account for the decision, then the fact that one of the motives is legally improper does not support a remedy as long as the employer can show that it would have made the same decision based on the legitimate ground alone—for take away the improper motive and the decision remains." *Dranchak v. Azko Nobel Inc.*, 88 F.3d 457, 461 (7th Cir. 1996).

Plaintiff's contention that he was given light duty in contradiction of Department practice, if not policy, is supported by the record. (*See* Pls. 56.1 Stmt. ¶ 48.) He has also presented evidence that he was subjected to heightened scrutiny around the time of his knee injury, (Pls. 56.1 Stmt. ¶ 169), that he was the only firefighter whom Grodek was ever directed to "watch," (*id.* ¶ 177), and that Grodek at least perceived the directive to watch Plaintiff as indicative of the administration's desire to get rid of him, (*id.* ¶ 176), which culminated in the charges filed against Plaintiff in January 2000. (*Id.* ¶ 178.) In addition, the record shows that Chief Jarvis thought Plaintiff was undesirable for a specialty team, (*id.* ¶ 162), too old for paramedic training, (*id.* ¶ 166), and had discussed his age in connection with his job performance on at least one occasion with Lieutenant Morton. (*Id.* ¶ 187.) There is at least some evidence that she directed Lieutenant Morton specifically to "keep a book on" Plaintiff and indicated to Richter that Plaintiff should retire with dignity. (*Id.* ¶¶ 163, 164.) Finally, Richter testified that Lieutenant Morton told him to tell Plaintiff to watch out because "the chief is out to get him." (*Id.* ¶ 165.) As such, the record contains evidence that Chief Jarvis expressed age-related animus against Plaintiff.

In the Seventh Circuit's two most recent mixed motive ADEA decisions, *Trahant* and *Abioye*, the court concluded that, even if it assumed the existence of some impermissible motive, the evidence of a wholly legitimate reason that would have produced the same employment decision regardless of any discriminatory reason, was overwhelming. *Abioye*, 164 F.3d at 369; *Trahant*, 121 F.3d at 1098. The court is less certain of such a conclusion here, where neither side has offered

evidence concerning the treatment of younger firefighters in circumstances similar to Plaintiff. Chief Jarvis' desire to rid Department of Plaintiff because of his age may have resulted in heightened scrutiny which produced grounds for charges she never would have brought against a younger worker. The court recognizes that Defendants' failure to present evidence concerning younger workers in this case may be a product of their belief that the burden to do so rested with Plaintiff. Where there is some direct evidence of age-based bias, however, the court believes that Defendants cannot prevail on summary judgment without showing that the adverse treatment would have been inflicted even in the absence of any discriminatory motive harbored by Chief Jarvis. They have not done so in this record. Summary judgment on the claim of adverse treatment is therefore denied.

### C.    Plaintiff Has Failed To Establish A Hostile Work Environment Claim

Defendants did not challenge Plaintiff's right to assert a claim for hostile work environment under the ADEA, but the court notes that the Seventh Circuit has assumed, without deciding, that plaintiffs may do so. *See Bennington*, 275 F.3d at 660.[24] After a thorough analysis of precedent, Judge James Alesia of this court recently held that a hostile work environment claim is in fact viable under the ADEA. *Alexander v. CIT Tech. Financing Svs., Inc.*, 2002 WL 69493, *4 (N.D. Ill. Jan. 18, 2002); *see also Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996) (stating "we find it a relatively uncontroversial proposition that such a theory is viable under the ADEA").

In order to establish a hostile work environment claim, Plaintiff must show a connection between age discrimination and the adverse conduct. *See Bennington*, 275 F.3d at 660 (finding no hostile work environment in absence of evidence that alleged offensive conduct was discriminatory). A plaintiff must show that the environment was both objectively and subjectively hostile because of illegal discrimination. *See Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993).

---

[24]    Defendants have also assumed that Plaintiff brought a hostile work environment claim against them, presumably because it was part of his first charge to the EEOC. Plaintiff did not explicitly plead a hostile work environment claim in his Second Amended Complaint, but the court will follow Defendants' lead in assuming that such a claim is before the court.

The Supreme Court has identified the frequency of discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with employee's work performance, as factors in whether a workplace environment is sufficiently hostile to support a claim under Title VII. *See Clark County School District v. Breeden*, 532 U.S. 268, 270-71 (2001). Plaintiff must show that the harassment he complains of was objectively "sufficiently severe or pervasive as to alter the conditions of [his] employment and to create an abusive working atmosphere." *Hardin*, 167 F.3d at 345.

Beyond the three particular complaints of adverse treatment discussed above, the heightened scrutiny Plaintiff endured around the time of his knee injury and/or in the weeks prior to having charges filed against him in January 2000 could conceivably support a hostile work environment claim. Notably, however, Plaintiff did not make a hostile work environment claim in his second EEOC charge (filed in September 2000) for the period leading up to his resignation. (*See* Second EEOC Charge, Ex. D to Defendants' Memo.)

Defendants argue that Plaintiff has abandoned all claims associated with his first EEOC charge. (Defendants' Reply Memorandum of Law, at 1.) In fact, for the period covered by that first charge, September 1997 through at least November 3, 1998,[25] Plaintiff has offered some evidence of an actionable hostile work environment. Focusing on the objectively hostile requirement, the relevant conduct includes the following: Chief Jarvis's "old farts" comment to Richter regarding specialty team membership in or around November 1997, (Pls. 56.1 Stmt. ¶ 162); Lieutenant Morton's telling Richter to tell the Plaintiff to watch out because "the chief is out to get him," in or around May 1998, (*id.* ¶ 165); Chief Jarvis's indicating to Richter that Plaintiff should retire "with dignity" in June or July 1998, (*id.* ¶ 163; Richter Dep., at 95); the incident with Lieutenant Morton's shouting at Plaintiff and commenting, "You need to retire already," and, "You've got to watch what

---

[25]     The parties have not addressed the period covered by the first charge and the court declines to do so here, noting only that the Plaintiff alleged continuing discrimination. (*See* First EEOC Charge, Ex. 2 to Lindeman Dep.)

you're doing because the chief ordered me to keep a book on you," at some point in 1998, (*see id.* ¶ 164); the (possibly) other incident when Plaintiff interpreted a comment of Lieutenant Morton's to be age-related criticism and Captain Kovarik was called in to help resolve the situation, (Defs. 56.1 Stmt. ¶¶ 120-122; Pls. 56.1 Stmt. ¶ 188); and other age-related comments and exhortations to retire that Plaintiff which may have occurred during the covered period, including Chief Jarvis's comment that Plaintiff was too old for paramedic school. (*See* Pls. 56.1 Stmt. ¶ 166.) Significantly, there is no evidence that Plaintiff was aware of many of these statements.

Even assuming Plaintiff knew about all of the negative remarks, they are insufficient to establish a hostile work environment claim. The environment that Plaintiff was subjected to was not so objectively offensive that it altered the conditions of his employment. The remarks complained of did not unreasonably interfere with Plaintiff's performance and are all the sort of "mere offensive utterances" that are not actionable. *See, e.g., Halloway v. Milwaukee County*, 180 F.3d 820, 827-28 (7th Cir. 1999) (finding subjectively offensive comments made to commissioner about his retirement, failure to keep his courtroom door open, and practice of resetting bail not sufficient to create a claim for hostile work environment under the ADEA); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (finding four national origin-related comments made over the course of more than a year insufficient because they did not unreasonably interfere with work performance). Defendants' motion for summary judgment on Plaintiff's hostile work environment claim is granted.

**D.      Plaintiff Has Failed To Establish A Constructive Discharge Claim**

To establish constructive discharge under the ADEA, a plaintiff must show that his working conditions were so intolerable that a reasonable person would have been compelled to resign, and that they were intolerable because of impermissible age discrimination. *See Bennington*, 275 F.3d at 660. Constructive discharge requires working conditions that are even more egregious than for a hostile work environment claim because in the ordinary case, employees are expected to remain employed while seeking redress. *Tutman*, 209 F.3d at 1050.

As discussed above, Plaintiff has presented some evidence linking his adverse working conditions with age discrimination. Plaintiff's complaint about being given light duty and having to check in regularly during his sick leave are not relevant to his constructive discharge claim because, as independently onerous aspects of his job, they were resolved long before he resigned in June 2000. There is also no evidence that whatever heightened scrutiny Plaintiff may have suffered in January 2000, just prior to Chief Jarvis's filing charges against him, continued for the next several months and contributed to Plaintiff's decision to resign.

Plaintiff's claim thus rests on the formal charges brought against him, presumably at least in part because of age discrimination. Plaintiff objected to the fact that the charges would be a matter of public record, and feared that they would jeopardize his standing in the community. (Pls. 56.1 Stmt. ¶ 37.) In addition, after formal charges are heard by the Board of Fire and Police Commissioners, there is an aggravation/mitigation period where Plaintiff's personnel file would have been aired and past disciplinary actions and indiscretions would have become a matter of public record. (Jarvis Dep., at 20-22.) Whether or not Plaintiff could have prevailed and defeated the charges, it would have been impossible for him to avoid public disclosure of the fact that he was charged, the details behind those charges, and several potentially embarrassing incidents dating back to 1993.

Even assuming the charges arose out of discriminatory motives, Plaintiff's concerns do not meet the high standard established by the Seventh Circuit for constructive discharge. The Seventh Circuit has found constructive discharge in circumstances far more egregious than those presented here. For example, in *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188 (7th Cir. 1992), a manager photographed an African-American employee while holding a gun to the employee's head and then circulated the picture at work, stating "this is what a n----- looks like with a gun to his head." *Id.* at 1191. So too the court has found constructive discharge when an African-American female employee was subjected to a series of offensive racial and sexual comments culminating in a physical threat while being shown a racist, pornographic photograph. *Brooms v.*

31

*Regal Tube Co.*, 881 F.2d 412, 423-24 (7th Cir. 1989).

On the other hand, the Seventh Circuit has rejected constructive discharge claims in a number of unpleasant circumstances. *See, e.g., Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001) (employer failed to promote African-American employee, saved stock work for her, wrongly accused her of stealing customers, monitored her to determine whether she was, in fact, stealing customers, gave sales leads to other employees, and advised other employees to come to work early to do stock work so as to not lose time off the sales floor); *Drake v. Minn. Mining & Manuf. Co.*, 134 F.3d 878, 886-87 (7th Cir. 1998) (husband and wife were shunned, received harassing phone calls, discovered that someone had gone through papers in their work locker, and were told once that their safety might be in jeopardy); *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996) (employer limited secretarial access to employee, denied flex-time request, barred speaking to colleagues about non-work matters, and truncated his breaks); *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993) (employee suffered arbitrary reprimand, exclusion from office activities, assignment to a fallow sales territory and lack of supervisor support); *see also Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 877-78 (7th Cir. 1999) (no "constructive demotion" where employee suffered a lack of support from a supervisor, failure by her company to assign new employees to her shift, alleged constraint on her ability to supervise a male subordinate, failure of colleague to support her efforts to discipline subordinates, supervisor's habit of scratching his genitals, supervisor's delay in discharging a threatening employee, and aborted mandate that she take a basic skills test).

Here, Plaintiff faced the prospect of a formal hearing on the charges against him. Rather than make his case before the Board of Fire and Police Commissioners, Plaintiff chose instead to resign. Although put in an awkward and potentially embarrassing position, Plaintiff would have had the opportunity to defend himself at the hearing. There has been no evidence presented that the charges, or anything else going on at the time, would have unreasonably interfered with his work performance or constituted even an actionable hostile work environment. Plaintiff was not

constructively discharged. Defendants' motion for summary judgment with respect to Plaintiff's claim of constructive discharge is granted.

### E. Plaintiff Has Failed To Show Any Connection Between His Speech And Allegedly Retaliatory Actions By Chief Jarvis

Finally, Plaintiff claims that Chief Jarvis's "campaign to terminate Plaintiff or force his resignation from the fire department" was retaliation against him because of his public criticism of her and the Department. (Plaintiff's Response, at 11.)[26] To succeed on his retaliation claim, Plaintiff must show that his speech was constitutionally protected and that Chief Jarvis's actions were motivated by that speech, and rebut any showing made by Defendants that Chief Jarvis would have taken the same actions regardless of his speech. *See Kokkinis*, 185 F.3d at 843.

Plaintiff claims that the adverse action suffered was Chief Jarvis's campaign to terminate him or force his resignation. (Plaintiff's Response, at 11.) The *Oak Brook Doings* article actually post-dates most of the comments and incidents identified by the Plaintiff as establishing Chief Jarvis's campaign against him, however. Plaintiff's only argument is that the article was published "within sufficient temporal proximity" to supply the necessary causal link. (Plaintiff's Response, at 11.) Indeed, a causal link may be established by showing that an adverse employment action took place "on the heels of protected activity." *Filipovic v. K & R Express Systems, Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)). The article, however, pre-dates the charges for insubordination and being absent without leave by more than nine months, and the events giving rise to such charges by more than three months. Where, as here, the only evidence of causation is temporal proximity, the Seventh Circuit has repeatedly declined to draw causal inferences from even brief intervals. *See, e.g., Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1010 (7th Cir. 2000) (one-year lapse between expression and employment action too attenuated); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998)

---

[26] Notwithstanding the allegations ¶¶ 51-52 of his Second Amended Complaint, Plaintiff states that the adverse consequences he was subjected to in retaliation did not include his light duty assignment in April 1999. (Plaintiff's Response, at 11.)

(eight months); *Juarez v. American Mobile Communications, Inc.*, 957 F.2d 317, 321 (six months); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five months); *Filipovic*, 176 F.3d 390, 399 (four months); *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918-19 (7th Cir. 2000) (three months).

As noted above, the court assumes that Chief Jarvis and other officers in the Department knew about the article. (*See* Pls. 56.1 Stmt. ¶¶ 175, 186, 193; Morton Dep., at 41-42.) This is insufficient, however, to create a genuine issue of fact as to whether Chief Jarvis "retaliated" against Plaintiff because of it. Defendants have proffered legitimate reasons for the actions that make up the alleged "campaign" to get rid of the Plaintiff, and Plaintiff has argued that Defendants took such actions because of his age. There is no indication that the actions were instead retaliation for the article. Insofar as Plaintiff cannot establish the required link between his expression and the adverse actions suffered, the court need not determine whether the April 9, 1999 *Doings* article is constitutionally protected speech. *See McKenzie v. Illinois Dept. of Trans.*, 92 F.3d 473, 483 (7th Cir. 1996) (requiring but-for causal link between protected expression and adverse action for Title VII retaliation claim). Defendants' motion for summary judgment against Plaintiff on his retaliation claim is granted.

## CONCLUSION

As discussed above, Plaintiff's adverse treatment claims are viable under a mixed motive theory of age discrimination. On that claim alone, Defendants' motion for summary judgment is denied. The court finds no disputes of material fact concerning Plaintiff's hostile environment, constructive discharge, or retaliation claims, however, and those claims are dismissed. The court notes that even if Plaintiff were to prevail on his remaining adverse treatment claim at trial, his recovery is likely to be modest. Even if the jury concludes that, but for his age, Plaintiff would not have been subjected to the treatment of which he complains, the fact that he has no claim for constructive discharge means that his damages are likely to be minimal.

34

Defendants' motion for summary judgment (Doc. No. 25-1) is granted in part and denied in part. This matter is referred to Magistrate Judge Sidney I. Schenkier for a settlement conference. Jury trial date of December 16, 2002 stands.

ENTER:

Dated: August 8, 2002

REBECCA R. PALLMEYER
United States District Judge